IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
JUDGE WALKER D. MILLER

Civil Action No. 05-cv-2248-WDM-CBS

THOMPSON R2-J SCHOOL DISTRICT,

      Plaintiff,

v.

LUKE P., by and through his parents and next friends, JEFF and JULIE P.,

      Defendants.

---

**ORDER**

---

Miller, J.

      This case arises under the Individuals with Disabilities Education Act ("IDEA" or "Act"), 20 U.S.C. §§ 1401-1485.[1]  Plaintiff Thompson R2-J School District (the "District") has filed a complaint seeking review of a state administrative law judge's decision.[2]  Upon consideration of the parties' written and oral arguments, as well as supplemental authority submitted after the close of briefing, I conclude that the administrative law judge's decision should be affirmed and the District's complaint dismissed.

Background

      The parties are Luke P. ("Luke"), a minor student at all times relevant to this case, who appears through his parents, Jeff and Julie P. ("Parents"), and the District.  They

---

[1]      The applicable statute was originally enacted as the Education of the Handicapped Act.  Cases decided prior to the reenactment as the IDEA in 1990 refer to the statute by its former title.

[2]      The issues have been briefed in a pleading styled as a motion for summary judgment, which is, in essence, an administrative appeal brief.

dispute whether the Act requires that the District pay the full costs of Luke's placement in an out-of-state private school.  Parents removed Luke from the District in December 2003. They requested a due process hearing pursuant to 20 U.S.C. § 1415 on January 21, 2005. A five day hearing was held in June 2005 before a hearing officer, who issued his decision on July 8, 2005, finding that the District had failed to provide Luke with a free appropriate public education ("FAPE") and requiring the District to reimburse Parents for the costs of the private school placement.  The District appealed the decision to the Office of the Administrative Courts.  Following review, Administrative Law Judge ("ALJ") Michelle A. Norcross affirmed the hearing officer's decision.

The evidence at the due process hearing established the following background information (facts are undisputed unless noted):

Luke, born in 1994, has been diagnosed with autism and mental retardation.  He attended kindergarten and first grade at Niwot Elementary in the St. Vrain School District, where his special education teacher was Margaret Wilson.  Margaret Wilson and the Niwot Elementary staff prepared two individualized education programs ("IEP") for Luke.  Luke's family moved to the Thompson School District in 2002 and enrolled Luke in Berthoud Elementary School.  Margaret Wilson met with the special education teacher at Berthoud Elementary, DeeAnn Wilson, and other efforts were made to ensure a smooth transition. Berthoud Elementary adapted the IEP from Niwot Elementary, which placed Luke in a special education class for part of the day and in the regular classroom with special

education support.[3]  Luke had opportunities to interact with typically developing peers in the classroom, at recess, and on the school bus.  At both the Niwot and Berthoud schools, Luke received supplemental speech and occupational therapy.

At this time, Luke's autism and mental retardation affected his home and school life in a variety of ways.  Luke's speaking vocabulary was limited (although he was capable of comprehending significantly more than he could express) and his social interactions were delayed.  He had significant self care issues.  Although he was basically toilet trained at school from the first grade, he was incontinent at home.  In addition, he had sleep problems, including staying up at night, refusing to sleep in a bed, and engaging in destructive behaviors.  His parents had to lock him in his bedroom at night.  Starting around age three or four, he had developed a habit of spreading night time bowel movements around his bedroom.  His parents removed carpets, curtains, and furnishings from the bedroom and created special sleep garments to try to inhibit this behavior.  In addition, Luke refused to eat all but a very limited number of foods, including yogurt, crackers, and croutons.  If given other foods, he would engage in a temper tantrum.  He would also behave inappropriately in public places.  He needed nearly constant supervision and monitoring, requiring assistance from Luke's grandparents and hired attendants.  The move to Thompson School District was in part because Luke's parents and grandparents decided to move into adjacent homes to assist with Luke's care needs.

Luke also had behavioral and learning issues at school.  Like many autistic children,

---

[3]The parties dispute whether Luke could have continued at Niwot Elementary even after his family's move to the Thompson School District.

Luke had difficulty generalizing what he learned, that is, applying skills he had learned in one environment to another.  Thus, while Luke might learn a skill such as washing his face at school, he might not be able to do it with a different person present or at home. Luke's teachers at Niwot Elementary noted that Luke also regressed in his skills; after the weekend, a significant part of the Monday class was spent on reconnecting and reinforcing previously learned material or skills.  Luke exhibited significant avoidance or refusal behaviors at school, including screaming, squawking, laying on the floor and flailing his arms and legs, and clearing the desk or pushing or throwing away unwanted items.  In order to address some of these issues, Margaret Wilson had developed a behavior plan for Luke at Niwot Elementary and worked with Luke's family to implement structures and techniques in the home.

Luke's Berthoud Elementary IEP team developed a new IEP for him in December 2002.  The plan contained goals addressing gross and fine motor skills, communication, sensory integration skills, self care skills (including face washing and feeding objectives, but not toileting as this had been achieved), independence in motor skills, academic functioning, and social interaction.  The IEP did not include a behavior plan but the team apparently continued to apply Margaret Wilson's behavior plan.  Margaret Wilson testified at the hearing she had told the Berthoud team at the transition meetings that a new behavior plan needed to be developed.  The Berthoud team used several strategies to help Luke generalize skills, including moving tasks from a "work" desk, where he worked on tasks with assistance, to an "independent desk," where he worked without assistance, to the regular classroom.  In addition, in response to expressed concerns by Luke's mother

about Luke's behavior at home, DeeAnn Wilson visited the home and suggested making a picture schedule using computer icons, similar to what Luke used at school, and other strategies. However, other than these sporadic efforts, the IEPs developed at Berthoud Elementary did not contain any support or training for Parents regarding Luke's behavioral, regression, or generalization problems.

Because of the increasing severity of Luke's behaviors (and his growing size and strength), Parents began to seek other educational and residential possibilities in late 2003. They consulted with Margaret Wilson, Luke's former special education teacher, and Diane Osaki, an occupational therapist who operates a private day school for children with autism.[4]  Luke's family visited and applied for admission to the Boston Higashi School ("BHS"), a residential school, in October 2003.  BHS specializes in educating children with autism and does not enroll any typically developing children.

In late 2003, Margaret Wilson administered the Autism Diagnostic Scale (ADOS). She wrote a letter to the family dated December 11, 2003, in which she reported several concerns, including that skills Luke had previously mastered were not present, that he used more primitive forms of communication than before, and that he was frequently out of his seat during the assessment.  In addition, she had not been able to administer the test at first because he became extremely frustrated and distressed; as a result, she had to restart the assessment.  Around the same time, Ms. Osaki observed Luke at Berthoud

---

[4]Parents also consulted with a psychiatrist, who prescribed sedatives, but the sedatives were ineffective except in high doses.  Parents also consulted social services about residential placements in the state but learned they would have to relinquish custody of Luke to pursue that option.

Elementary for a four hour period.  She prepared a report for Parents, in which she noted numerous behavioral problems (crying, screaming, tantruming, and other resistance), some lasting up to 40 minutes, during what was reported to be a "typical" day. She also reported her evaluation that the staff at Berthoud Elementary were inadvertently reinforcing the negative behaviors.  She opined that Luke had regressed in verbal communication and independence and was using unwanted behavior to avoid  tasks and communicate basic needs.  She recommended, *inter alia*, "12 month programming to reduce the risk of regression," and parent training.

On December 16, 2003, the parties met for the triennial IEP meeting.  Both of Luke's parents attended, as well as Dee Ann Wilson, Beth Fraley (the regular education teacher), and other personnel.  At the meeting, Parents presented a list of goals for the following year that they wanted included in Luke's IEP.  However, Luke's father stated he did not think these goals were attainable in the present placement and that a residential placement was needed.  The IEP staff requested the opportunity to revise the IEP using the list of goals created by Parents.  They also began developing a new behavior plan to respond to Luke's problem behaviors.  They requested a copy of Ms. Osaki's report to assist in responding to the issues she observed.  Parents sent Ms. Osaki's report and the ADOS materials from Margaret Wilson to BHS, but not the District.  Just after the IEP meeting, Luke was accepted at BHS.  On December 19, 2003, counsel for Parents sent a letter advising the school district that Parents intended to remove Luke from the District and enroll him at BHS. The final version of Berthoud Elementary's IEP incorporated most of the issues from Parents' list of goals and was sent to Parents on January 15, 2004;

6

however, the plan did not include a residential placement.

There is significant dispute as to Luke's academic and developmental progress while at Berthoud Elementary.  The hearing officer found that the IEPs demonstrated that Luke made some progress on the goals contained in those documents, but that he was not able to generalize his learning experiences at school to home and other contexts.  This conclusion is supported by a preponderance of the evidence on the record and the parties do not dispute Luke's extreme difficulty with generalization.  In addition, the hearing officer found that Luke's behavioral problems manifested at school and home and prevented his participation in the community and integration in society.  This is also supported by a preponderance of the evidence.  Several expert witnesses, found to be credible by the hearing officer, testified that Luke's disruptive behaviors were an impediment to his ability to obtain an education at Berthoud Elementary.  The defendants contend that the IEPs demonstrate that the goals for Luke in the third grade were essentially the same as his kindergarten and first grade goals, showing little meaningful progress.  I disagree with this characterization; while some goals are similar, a comparison of his third grade IEP and kindergarten IEP demonstrates that Luke progressed in several areas.  However, this is not inconsistent with a finding, supported by the testimony of Luke's father, Margaret Wilson and Ms. Osaki (who had assessed Luke when he was younger), that Luke had also regressed in key areas, including with respect to communication skills and behavioral control.

Margaret Wilson, Ms. Osaki, and Dr. Ellen Hanson, a psychologist, as well as other experts, testified that residential placement was needed because Luke's unique needs and

maladaptive behaviors required a completely consistent and reinforcing approach available only in a residential setting with specialists in educating children with autism. This is so that appropriate behaviors would become completely automatic and engrained across environments. Several witnesses testified that the ability to self-regulate behavior, which Luke was lacking, was essential to any real academic progress. Margaret Wilson testified in particular that she felt the residential placement was needed, despite her general preference for non-residential education, because even after she and the family had tried very hard to apply consistent strategies at home and at school, the efforts were unsuccessful.

The District presented testimony from two expert witnesses, Dr. Phillip Strain and Dr. Glen Dunlap. Both opined that a residential placement was not necessary because the consistent behavioral techniques Luke needed could be implemented in the home and regular school environment and because autistic children generally benefit from having interactions with typically developing children. These witnesses testified that the IEP prepared by the Berthoud team would provide an appropriate education to Luke. However, because neither of these experts had met or examined Luke, spoken with his parents or educators, or were aware of his sleeping and other self-care issues at home, the hearing officer gave their opinions less weight.

The parties also dispute how much progress Luke made after his time at BHS. Luke attends BHS for approximately 44 weeks per year, where he is supervised 24 hours a day, and the remaining eight weeks are spent with his family. The family visits are supported and monitored by BHS staff. It does not appear to be disputed that at the time of the due

process hearing, Luke was toilet trained, could dress and undress himself, was eating a variety of foods, and was sleeping regularly in a bed, although he continued to engage in some challenging and resistive behaviors.

The hearing officer determined that educating Luke required addressing Luke's difficulty with generalizing learned skills, his tendency towards regression, his need to overcome social and communication difficulties, and his academic problems. The hearing officer also concluded that Luke's education required special emphasis on his daily life and self care skills, including sleeping, eating, toilet training, and engaging in elementary communication and appropriate behaviors, which had to be functional outside of the school environment. Although the IEP developed by the Berthoud team addressed substantive aspect of his autism, social and communication problems, and mental retardation, the hearing officer opined that the skills would not be transferred and the IEP did not address Luke's problems with regression. The hearing officer noted that Luke "will derive no benefit at all from attaining goals and objectives in school if he cannot replicate any of his accomplishments anywhere else. The skills involved are not embellishments and frills. They are the most basic ingredients to social functioning, such as eating, sleeping, dressing, toilet training, communicating, and proper behavior."

The hearing officer found the evidence to be persuasive that only a residential placement would be adequate to create a reasonable chance of producing the result of self-sufficiency. The hearing officer concluded that the December 2003 IEP failed not because its goals were inadequate, but because they could not be achieved outside of a residential placement. The hearing officer also found that residential placement was the

9

least restrictive appropriate environment for Luke, based on the evidence presented at the hearing.  In addition, because the need for residential placement is related to Luke's educational needs, the District was required to reimburse Parents for Luke's education at BHS from January 12, 2004 until his placement is changed pursuant to law.

On administrative appeal, the ALJ agreed with the hearing officer that the District's IEP "demonstrates a monumental and genuine effort on the part of the District to improve [Luke's] performance in a number of areas affected by his autism."  In addition, the ALJ found that Luke had achieved or was making progress towards several goals and objectives in his IEP, although regressing in other areas, but the problem was that he could not transfer his learned skills outside of the school.  However, since entering BHS, Luke's self-care skills and behavior had improved.  The ALJ found that the record supported the hearing officer's credibility determinations as to the various experts and the determination that only a residential placement was appropriate to ensure that Luke received more than a *de minimis* education.  In particular, the ALJ noted that behavioral self-regulation skills "are access and foundational skills and academic education cannot occur if these other issues are not addressed."  Because the weight of the evidence indicated that Luke could not learn these skills outside of a residential placement, the IEP developed by the District did not provide a FAPE.  The ALJ noted that the Supreme Court in *Rowley* declined to accept self-sufficiency as a substantive standard under the IDEA, but nonetheless concluded that "it remains an important element in determining whether the services provided to a handicapped child are educational[ly] beneficial."

Standard of Review

10

The Act provides for judicial review of administrative findings and decisions. 20 U.S.C. § 1415(i)(2)(A). Pursuant to this statute, the court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." § 1415(i)(2)(C). Thus, my review of this IDEA challenge is a "modified *de novo* review." *Erickson v. Albuquerque Public Schools*, 199 F.3d 1116, 1120 (10th Cir. 1999); *O'Toole v. Olathe Dist. Schools Unified School Dist. No. 233*, 144 F.3d 692, 698 (10th Cir. 1998) (the district court must "independently review the evidence contained in the administrative record, accept and review additional evidence, if necessary, and make a decision based on the preponderance of the evidence, while giving 'due weight' to the administrative proceedings below") (quotation omitted); *see also L.B., and J.B., on behalf of K.B., v. Nebo Sch. Dist.,* 379 F.3d 966, 973-74 (10th Cir. 2004) (noting that summary judgment in an IDEA case may under some circumstances be better described as a judgment on the record).

The burden of proof in an administrative hearing challenging an IEP is placed upon the party seeking relief, in this case Luke and Parents. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49 (2005).

Discussion

1.   The IDEA, generally

The Act is designed to provide children with disabilities access to a free appropriate public education designed to meet their particular needs. *O'Toole*, 144 F.3d at 698. The "floor" requirements imposed by federal law consist of "access to specialized instruction

11

and related services which are *individually designed to provide educational benefit* to the handicapped child." *Id.* (quoting *Board of Education v. Rowley*, 102 S.Ct. 3034, 3048 (1982); emphasis in quoted material). State law may provide a higher level of education for its disabled students, but it may not provide a lower level. *Id.*

A FAPE is defined by statute as "special education and related services" that are provided at public expense; meet the standards of the state educational agency; include preschool, elementary, and secondary education; and conform with an IEP. 20 U.S.C. § 1401(9). The basic mechanism for providing a FAPE is the IEP. An IEP is defined as "a written statement for each child with a disability that is developed, reviewed and revised in accordance with this section and that includes," *inter alia*, statements of: (1) the child's present levels of educational performance, (2) annual goals, and (3) the special education services and aids to be provided to the child. § 1414(d)(1)(A) (listing eight requirements for an IEP).

Upon completion of an IEP, the IEP "team" must decide placement, or the locale where the IEP will be implemented. The statue requires that the placement be in "the least restrictive environment" to the maximum extent possible, reflecting the statute's general goal of educating children with disabilities with their typically developing peers. 20 U.S.C. § 1412(a)(5).

In 1985, the Supreme Court ruled that, if a school district defaults on its obligation to provide a FAPE, parents of a disabled child may seek reimbursement of costs and expenses incurred in unilaterally placing the child in an appropriate private facility. *School Committee of Burlington v. Dep't of Education of Massachusetts*, 105 S.Ct. 1996 (1985).

In response to this holding, Congress amended the IDEA in 1997 to clarify that a school district is not required to provide education costs or services for a child placed in a private facility if the public school made a FAPE available but the parents unilaterally elected to withdraw the child from public education.  Thus, the IDEA

> does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility.

§ 1412(a)(10)(C)(i).

Reimbursement to the parents is still required, however, if a court or hearing officer finds that the local educational agency did not make a free appropriate public education available to the child in a timely manner prior to the child's enrollment in the private school. § 1412(a)(10)(C)(ii).  This reimbursement may be limited in some instances, including if the parents did not object to the agency's proposed placement at the most recent IEP meeting prior to the removal of the child from public school, if the parents did not give timely written notice of their rejection of the proposed placement,[5] if the parents failed to make the child available for evaluation by the school district, or if a court finds the parents have acted unreasonably.  § 1412(a)(10)(C)(iii).

2.    District's Objections

The District raises several objections to the hearing officer's and ALJ's decisions. First, the District argues that the IEP developed by the Berthoud team in December 2003

---

[5]    The exceptions to the notice requirement are not pertinent here. § 1412(10)(C)(iv).

satisfied the requirements of the IDEA because it was "reasonably calculated to provide some educational benefit."  The District contends that the administrative decisionmakers erred by imposing a substantive "self-sufficiency" outcome standard, which the IDEA does not require.  Second, the District argues Luke's placement at BHS does not satisfy the IDEA because it is not the least restrictive placement.  Third, the District argues that Parents acted unreasonably by removing Luke from the District before completion of the IEP.  Fourth, the District asserts that Parents failed to provide adequate notice and are therefore not entitled to reimbursement for their unilateral placement decision.  The District's final argument is that Parents failed to demonstrate that the costs of BHS are reasonable.

> A.    Adequacy of the IEP

The threshold issue in this case is whether the December 2003 IEP was adequate. In reviewing the adequacy of an IEP, the court first determines "whether the State complied with IDEA procedures, including whether the IEP conformed with the requirements of the Act." *Urban v. Jefferson County Sch. Dist. R-1*, 89 F.3d 720, 726 (10th Cir. 1996).  The second step is to determine "whether the IEP was reasonably calculated to enable [the student] to receive educational benefits." *Id.*  The adequacy of the IEP must be viewed from the perspective of the IEP team at the time it was written.  *O'Toole*, 144 F.3d at 701 ("the measure and adequacy of an IEP can only be determined as of the time it is offered to the student, and not at some later date") (quoting *Carlisle Area School v. Scott* ¶., 62 F.3d 520, 534 (3rd Cir. 1995)).

Under *O'Toole,* an IEP is a "program, consisting of both the written IEP document,

and the subsequent implementation of that document.  While we evaluate the adequacy of the document from the perspective of the time it is written, the implementation of the program is an ongoing, dynamic activity, which obviously must be evaluated as such." 144 F.3d at 702 ("we do not hold that a school district can ignore the fact that an IEP is clearly failing, nor can it continue to implement year after year, without change, an IEP which fails to confer educational benefits on the student").

The parties apparently do not dispute that the procedural requirements of the IDEA were satisfied.  The issue, then, is whether the IEP was not reasonably designed to enable Luke to receive some educational benefits because it did not recommend a residential placement.  It is well established that the IDEA does not require placement in a residential facility in order to maximize the student's potential.  *O'Toole*, 144 F.3d at 708; *see also Abrahamson v. Hershman*, 701 F.2d 223, 227 (1st Cir. 1983) ("A handicapped child who would make educational progress in a day program would not be entitled to placement in a residential school merely because the latter would more nearly enable the child to reach his or her full potential").  However, the benefit conferred by the IEP must be more than *de minimis*.  *Urban*, 89 F.3d at 727.  If an IEP is reasonably calculated to confer a reasonable educational benefit and if the student makes progress toward achieving the IEP goals, the IDEA does not require more from a school district, particularly where a parent unilaterally denies the district the opportunity to modify or amend the placement or IEP.  *O'Toole*, 144 F.3d at 708.

I agree with the ALJ that IEP and the placement recommended by the District in the IEP was inadequate to confer more than a *de minimis* educational benefit on Luke.  I base

15

this on the ALJ's determination, which is supported by the preponderance of the evidence, that Luke's behavioral issues were impacting his ability to derive the educational benefits in the IEP.   In addition, whatever educational progress Luke made on the most fundamental life skills, such as feeding and toileting and communicating basic needs, was meaningless if there was no strategy to ensure that those skills would be transferred outside of the school environment and not lost due to regression.  I agree with the District that the hearing officer's decision was in error to the extent that it imposed a substantive "self-sufficiency" standard of achievement, which is not supported by the governing case law.  *See Rowley* 458 U.S. at 201 n. 23 ("we cannot conclude . . . that self-sufficiency was itself the substantive standard which Congress imposed upon the States.")  Nonetheless, as noted by the ALJ, self-sufficiency is an important underlying policy goal and serves to explain the importance of the areas of challenge to Luke, specifically basic life skills and behavioral self-regulation skills, which are the essential prerequisites to academic progress.

The record supports the finding of the hearing officer and ALJ that Luke's behavioral issues and eating, sleeping, and toileting problems prevented meaningful access to educational benefits.  As discussed by the ALJ, the focus in determining whether residential placement is necessary for a child with such issues is "whether the placement is required for educational purposes apart from the medical, social or emotional problems that are segregable from the learning process."  *Ash v. Lake Oswego Sch. Dist. No. 7J,* 766 F. Supp. 852 (D. Or. 1991) (*citing Kruelle v. New Castle County Sch. Dist.,* 642 F.2d 687, 693 (3d Cir. 1981) and *Vander Malle v. Ambach*, 667 F. Supp. 1015 (S.D.N.Y. 1987)).

16

Here, Parents have shown by a preponderance of the evidence that Luke's social and emotional issues, at the time of the December 2003 IEP, were not segregable from the learning process. His dysfunctional eating and sleeping habits, which affect his behavior and long-term functioning, clearly impact his ability to get any benefit from what he learns at school. Moreover, there is significant evidence on the record demonstrating that the Luke's behavioral problems were interfering with his ability to obtain educational benefits, as it appeared the staff at his school had to spend an inordinate amount of time responding to his tantrums and resistance behavior, which were not improving. Finally, while the inability to generalize certain academic skills across environments would not always mean that an IEP is not providing an educational benefit, I must agree with the administrative decisionmakers that the lack of generalization of the most basic life skills, such as appropriate behavior, toileting, and eating indicate that the educational benefits received by Luke in December 2003 were *de minimis*. The evidence that Luke's maladaptive behaviors were increasing, even as he made small gains in some academic areas, and that he had regressed in his communication and other important areas, further reinforce this finding.

I am also persuaded by the expert and other evidence presented indicating that, at the time, the IEP could not adequately address these needs because Luke needed a consistent regimen of behavior modification in order to establish these fundamental skills. *See S.C. v. Deptford Township Board of Ed.,* 248 F. Supp. 2d 368, 377 (D.N.J. 2003) (expert testimony that child needed 24 hour program, as well as other witness testimony showing that child's behavior at home and at school prevented academic advancement,

demonstrated need for residential placement); *Ash*, 766 F. Supp. at 863 (residential placement needed so that daily living skills, such as toileting, eating, and dressing, could be taught and reinforced in a consistent manner).   I note that the December 2003 IEP contained a behavior support plan, which was intended to address Luke's negative behaviors and included a recommendation to offer training to Parents to assist in providing consistency and generalizing the appropriate standards.   This is a significant improvement and, as noted by the administrative officers, demonstrates the genuine good faith efforts by the Berthoud team to respond to Luke's needs.   However, I credit the testimony of the expert witnesses who opined that this plan was too limited in its approach and relied too much on strategies that had been proved ineffective with Luke.

I also take note of the testimony of Dr. Dunlap, one of the District's expert witnesses, who opined that Luke's behaviors could be improved with a 24-hour consistent approach in the home and school.   However, neither Dr. Dunlap nor the IEP proposed such a program or supplemental services.   Moreover, the testimony of Margaret Wilson, whom the hearing officer found to be credible, is persuasive on this point.   She testified that her efforts to implement just such a consistent approach between the home and school were unsuccessful despite hard work and sincere effort by the school and family.   This, in combination with the numerous autism experts who testified that the nature of Luke's problems required a residential placement, persuades me that the reinforcement and consistency Luke needed to make educational progress could not be achieved in a regular school setting at that time.

B.     Least restrictive environment

18

The District also argues that Luke's placement at BHS violates the IDEA because it is it is not the least restrictive environment ("LRE") in which he can be placed. Specifically, the District contends that the ALJ and hearing officer failed to apply the appropriate legal test for determining whether a placement is the LRE as articulated in *Nebo*. As noted by the *Nebo* court, the IDEA mandates that disabled children be educated in regular classroom to the maximum extent possible. 379 F.3d at 976. In determining whether the LRE mandate has been violated, the court first determines whether education in a regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily; and, if not, determines if the school district has mainstreamed the child to the maximum extent possible. *Id*. In considering the first prong of the test, courts may consider the following non-exhaustive list of factors: (1) steps the school district has taken to accommodate the child in the regular classroom, including the consideration of a continuum of placement and support services; (2) comparison of academic benefits the child will receive in the regular classroom with those she will receive in the special education classroom; (3) the child's overall educational experience in regular education, including non-academic benefits; and (4) the effect on the regular classroom of the disabled child's presence in the classroom. *Id*.

The hearing officer declined to apply the *Nebo* factors on the grounds that it did not apply in a case where the party seeking relief desires the more restrictive environment. The ALJ determined that in the decision, the hearing officer had in fact implicitly considered several of the *Nebo* factors, including the steps taken by the District to accommodate Luke in the regular classroom, the academic benefits Luke received in the

regular classroom and those at BHS, and accounted for the non-academic benefits Luke received in the regular classroom.[6]

There is case law that indicates that different LRE standards apply to a parental placement than a school district placement. *Knable ex rel Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 770 (6th Cir. 2001) (parents are not required to prove that the private placement they have selected is the least restrictive environment). I agree that even if the hearing officer erred by declining to expressly make findings under *Nebo*, his decision accounted for many of the relevant factors. Moreover, the IDEA requires that disabled students be educated in the "least restrictive *appropriate* educational environment." *Ridgewood Board of Education v. N.E.*, 172 F.3d 238, 249 (3d Cir. 1999) (emphasis in the original). Since the hearing officer and ALJ found that in December 2003, the BHS placement was appropriate and the Berthoud Elementary placement was not, the fact that BHS was more restrictive than Berthoud Elementary does not mean that the IDEA was violated.[7] Since no other placement options were offered, the evidence does not establish that there was a less restrictive appropriate placement for Luke at the time.

---

[6]I note in particular the testimony of Diane Osaki, who persuasively opined that as Luke's negative behavior increased, he had to be more limited and isolated, thus reducing the likelihood he could obtain any benefit from being in a non-segregated environment. Even the District's expert witness, Dr. Dunlap, testified that exposure to typically developing children was not an "absolute" in educating autistic children.

[7]However, this is not a static state of affairs. The record included testimony from a school administrator at BHS that one goal of the program is to make it possible for the students to be educable outside of a residential program. It appears that at some point in the future, once fundamental behavioral and life skills are sufficiently engrained and reinforced, it might be possible to educate Luke in a non-residential public school environment, given the proper support services.

C.    <u>Reasonableness</u>

The District also argues that Parents are not entitled to reimbursement because they acted unreasonably. *See e.g., Loren v. Atlanta Indep. Sch. Dist.*, 349 F.3d 1309 (11th Cir. 2003).  In particular, the District argues that Parents' actions in failing to share the evaluations and recommendations of Margaret Wilson and Ms. Osaki with the Berthoud Elementary staff, but rather using these materials only for Luke's application to BHS, show that Parents were "gaming the system" to extract free tuition for private school.  The District also points to Parents' delay in requesting a due process hearing and obtaining evidence in the interim to support the residential placement.[8]  The hearing officer declined to make a finding on this issue, but the ALJ found that Parents did not act in bad faith. Rather, Parents merely "took the initiative to consult with experts in the field of autism about [Luke's] deteriorating behavior and explore residential placement options prior to discussing their efforts with the District."

Although I have some concerns about Parents' failure to share important information with the District concerning Luke's educational needs and their rejection of the Berthoud Elementary placement before the IEP was finalized, the record overall demonstrates that Parents engaged in the IEP process for several years and worked with the District to implement a program that would work for Luke.  Unlike the cases cited by the District, it does not appear that Parents frustrated the District's efforts to create an appropriate IEP.

---

[8]The District also argues that the failure of Parents and BHS to make available certain records from BHS indicates the unreasonableness of their action.  However, since this occurred post-placement, and the District has not demonstrated how these records would have changed any outcome, I do not consider this evidence to be material.

Moreover, I consider relevant to this inquiry whether, even with this information, the District would have been able to create an IEP that could have addressed Luke's needs. The District's expert witness, Dr. Dunlap, opined that the consistency and training Luke needed to obtain educational benefit could be created in a day and home program, but he offered no specifics as to how this could be implemented. Moreover, I see no record evidence to show that the District had the services, experience, or ability to provide such a program or other effective alternative to the residential placement.

D.   Notice

The District contends that Parents are not entitled to reimbursement because they failed to provide proper notice under the statute. Under 20 U.S.C. § 1412(a)(10(C)(iii)(1), a prerequisite to reimbursement is notice to the IEP team that the parents are rejecting the placement proposed by the public agency, including a statement of the parents' concerns and intent to enroll the child in a private school. This notice may be given at the most recent IEP meeting attended by the parents or in writing 10 days before removal of the child from the public school. *Id.* I agree with the hearing officer and the ALJ, who both determined that Parents provided adequate notice to the District by letter dated December 19, 2003.

E.   Evidence of Costs

Finally, the District argues that Parents failed to demonstrate that the costs of BHS are reasonable. It appears that Parents made a written offer of proof as to the costs of BHS, but that otherwise no evidence of reasonableness was introduced. A parallel case is now pending in front of my colleague Judge Robert E. Blackburn (Case No. 05-cv-1396-

REB-CBS) concerning the costs of the BHS placement.  Judge Blackburn has ordered the District to pay all reasonable costs associated with Luke's education at BHS for as long as BHS is Luke's placement under the IDEA.  Since Parents were required to establish their costs, and the reasonableness of such costs, in those proceedings, any error at the administrative level in this regard is moot.

Accordingly, it is ordered:

1.    Plaintiff's Motion for Summary Judgment is denied and its objections to the administrative law judge's decision are overruled.

2.    Judgment shall enter against Plaintiff and in favor of Defendants, dismissing Plaintiff's complaint with prejudice.

DATED at Denver, Colorado, on June 27, 2007.

BY THE COURT:

s/ Walker D. Miller
United States District Judge